UNITED STATES of America,
Plaintiff,

v.

PAN AMERICAN MAIL LINE, INC.,
Defendant.

No. 69 Civ. 2381.

United States District Court,
S. D. New York.

Sept. 5, 1972.

Whitney North Seymour, Jr., U. S. Atty., by Gilbert S. Fleischer, Attorney-in-Charge, Admiralty and Shipping Section, U. S. Dept. of Justice, New York City, for plaintiff.

Edwin Longcope, Hill, Betts & Nash, New York City, for defendant.

PIERCE, District Judge.

## OPINION

The United States claims that Pan American Mail Line has violated Section 18 of the Shipping Act, as amended, 46

U.S.C. § 817(b)(3)[1] by collecting an amount different from that stated in its tariff on file with the Federal Maritime Commission (hereinafter "the Commission"). The government seeks imposition of a civil penalty pursuant to 46 U.S.C. § 817(b)(6)[2] and it has moved for summary judgment. The parties have submitted affidavits and briefs, including supplemental briefs at the Court's request.

Rule 56 of the F.R.Civ.P. provides that summary judgment may be granted only upon a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." It is clear that great care must be exercised in considering a motion for summary judgment and where there is any doubt as to the facts of a case, the motion must be denied. Dolgow v. Anderson, 438 F.2d 825 (2d Cir. 1971); Doehler Metal Furniture Co. v. United States, 149 F.2d 130 (2d Cir. 1945).

The parties do not dispute certain facts in this case. Defendant has admitted in its answer that during the period between July 1, 1965 and July 27, 1966 it was a common carrier by water engaged in foreign commerce, that is, engaged in the transportation of cargo between United States Atlantic ports and Cristobal, Canal Zone; that at all relevant times it was a corporation organized and existing under the laws of a foreign nation; that it transacts business through an agent; and that it is located within this district and within the jurisdiction of this Court.

In addition, all are agreed that prior to July 1, 1965 defendant's tariff contained the following provision on "Original page No. 8B," effective between July 1, 1964 and June 2, 1965, and on "Supplement No. 1 to Original page No. 8B," effective between June 3, 1965 and June 30, 1965:

"Item 8 (continued) . . . .

"All shipments from the following ports are subject to the charges specified below:

MIAMI, FLORIDA:

Handling—$1.35 per 40 cu. ft. or 2,000 lbs. as freighted with the exception of: AUTOMOBILES—$5.00 per unit.

Wharfage—$.30 per 2,000 lbs. with the exception of AUTOMOBILES— $1.00 per unit; TRUCKS—$2.00 per unit.

Minimum Wharfage and Handling Charges are $.30 and $1.35 respectively."

As of July 1, 1965 this language was deleted by "1st Revised Page No. 8B." In the introductory portion of defendant's tariff, however, on page "FMC-F No. 3 Original page No. 2," the following provisions remained as of July 1, 1965:

"Item 1. *Application of Rates* . .

"(b) . . . Any tollage, wharfage handling and/or unloading will be for account of the cargo."

Pan American filed a new tariff, effective on January 1, 1966, which was apparently designated "FMC—No. 4." The above language appeared on page 4 of the new tariff. This same provision appear-

---

1. Section 817(b)(3) provides, in relevant part:

No common carrier by water in foreign commerce or conference of such carriers shall charge or demand or collect or receive a greater or less or different compensation for the transportation of property or for any service in connection therewith than the rates and charges which are specified in its tariffs on file with the Commission and duly published and in effect at the time; nor shall any such carrier rebate, refund, or remit in any manner or by any device any portion of the rates or charges so specified, nor extend or deny to any person any privilege or facility, except in accordance with such tariffs.

2. Section 817(b)(6) states:

Whoever violates any provision of this section shall be [liable] to a civil penalty of not more than $1,000 for each day such violation continues, [to be recovered by the United States in a civil action.]

ed again on the first revised page 4, effective June 3, 1966. It was deleted entirely from defendant's tariff by amendment effective July 28, 1966.[3]

The defendant has admitted that subsequent to July 1, 1965, from approximately October 14, 1965 until July 27, 1966, it paid handling and wharfage charges for all cargo it carried through Miami. Affidavit of Edwin Longcope, dated December 17, 1971; Defendant's Answer to Interrogatories, dated April 30, 1971. See also Plaintiff's Exhibit 1. To exemplify defendant's actions, the government has adduced proof, through defendant's admissions that these charges were paid by defendant for three specific voyages dated October 14, 1965, March 25, 1966 and June 14, 1966. See Affidavit of Edwin Longcope, dated December 17, 1971; Defendant's Answers to Interrogatories dated April 30, 1971.

The government contends that these undisputed facts constitute the material facts which it must establish in order to recover as a matter of law. Defendant argues, however, that the general language regarding wharfage and handling appeared in its tariff between July 1, 1965 and July 27, 1966 as a result of inadvertence. It urges that intent is material to the question at hand

and that a trial on this issue is necessary. Likewise, it argues that the word "absorption," found in Plaintiff's Exhibit 1, is a term of art which can be understood only after a trial. Defendant also claims that this case should be referred to the Commission. In addition, Pan American contends that an apportionment, such as that set out in the introductory portion of defendant's tariff, is ineffective unless implemented by a specific rate. Finally, defendant asserts that the government has not suggested any basis for applying a penalty.

### A. Primary Jurisdiction

Preliminarily the Court must determine whether the case is properly before it at this time. Defendant has argued, in its papers and informally, that the Commission must decide whether defendant violated § 817(b) before the government may sue in district court to recover a penalty. Pan American points to 46 U.S.C. §§ 821, 822 in support of its position. It also asserts that the Commission's expertise in tariff interpretation and administration requires the Court to defer, at least temporarily, to proceedings which should be instituted before the Commission. In this fashion, it is argued, decisional uniformity

---

3. Insofar as the Court can determine defendant reinstituted its practice of charging shippers for tollage, wharfage and handling assessed at Miami by "FMC No. 4, page 13, third revision," effective as of April 9, 1967:

| Rule No. 19 (I) | Additional Charges |
|---|---|

Any tollage, wharfage, handling and/or other charges assessed against the cargo at Miami, will be for the account of cargo, as follows:

Loading and Discharge Charges at the Port of Miami, Florida:

| Handling—General Cargo | $ 1.95 W/M as freighted |
|---|---|
|     Automobiles | 5.00 per unit |
|     Boats up to 20 feet | $10.00 per unit |
|       20 and 25 feet | 15.00 |
|       over 25 feet | 25.00 |
|     Pick-up Trucks | 10.00 |
|     Buses, Vans and Trucks | 5.00 |
|     Trailers and Heavy Trailers | 25.00 |
|     Lumber | 4.63 per MBF |
| Wharfage—General Cargo | .30 per W |
|     Automobiles | 1.00 per unit |
|     All other units | 2.00 per unit |

This practice continued at least through "FMC No. 4, page 13, sixteenth revision," effective April 16, 1970, which stated the charges in similar fashion, although many of the respective amounts were increased.

within the tariff system may be assured. The government responds that defendant's argument is unfounded and cites United States v. Anchor Line, 257 F.Supp. 99 (S.D.N.Y.1967); United States v. Federal Steam Navigation Co., 64 Civ. 2061 (S.D.N.Y. September 1, 1965); and United States v. Dittlev-Simonsen Lines, et al., No. 41912 (N.D. Cal. October 9, 1964) in support of its position.

■ The Court is persuaded that the *Anchor Line* case correctly construes the Shipping Act. Section 821 authorizes complaint to the Commission alleging a violation and investigation by the Commission on its own initiative; it also authorizes the award of reparations where violations are found. Section 822 specifies that orders of the Commission relating to violations shall be made only after a full hearing. Section 817(b)(6), on the other hand, permits the United States to institute a civil action for recovery of penalties for violations of certain provisions of the act; nowhere in the statute has Congress suggested that proceedings under §§ 821 and 822 are necessary predicates to the institution of a § 817(b)(6) action. See also 1961 U.S.Code Cong. and Admin.News, pp. 3125–3126.

■ Furthermore, insofar as defendant claims that the instant situation falls within the concept of primary jurisdiction, its arguments are misplaced. As the Second Circuit has recently stated in Danna v. Air France, et al., 463 F.2d 407 (2d Cir. 1972), claims that a tariff has been violated or unequally applied are properly brought before a court. Granting that *Danna* arose in a context different from the case at bar, the principle stated merely recasts the broader proposition enunciated in United States Navigation Co. v. Cunard S.S. Co., 284 U S. 474, 481–482, 52 S.Ct. 247, 249, 76 L.Ed. 408 (1932):

. . . resort · . . . must be had where a rate, rule or practice is attacked as unreasonable or as unjustly

discriminatory, and also where it is necessary in the construction of a tariff, to determine upon evidence the peculiar meaning of words or the existence of incidents alleged to be attacked by the usage to the transaction . . . . "But what construction shall be given to a railroad tariff presents ordinarily a question of law which does not differ in character from those presented when the construction of any other document is in dispute."

See United States v. Western Pacific R.R., 352 U.S. 59, 69, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); Board of Railroad Commissioners v. Great Northern Ry., 281 U.S. 412, 421–422, 50 S.Ct. 391, 74 L.Ed. 936 (1930); Great Northern Ry. v. Merchants Elevator Co., 259 U.S. 285, 291, 294, 42 S.Ct. 477, 66 L.Ed. 943 (1922); Pennsylvania R. R. v. Int'l Coal Mining Co., 230 U.S. 184, 196–197, 33 S.Ct. 893, 57 L.Ed. 1446 (1913); CAB v. Modern Air Transport, Inc., 179 F.2d 622, 625 (2d Cir. 1950); 3 K.Davis, Administrative Law Treatise §§ 19.01–.02 (1958, Supp.1970); Fremlin, Primary Jurisdiction and the Federal Maritime Commission, 18 Hastings L.J. 733 (1967). See also Far East Conference v. United States, 342 U.S. 570, 573–575, 72 S.Ct. 492, 96 L.Ed. 576 (1952).

■ This Court finds, as did the Court in United States v. Dittlev-Simonsen Lines, *supra*, that no special expertise is necessary to resolve the issue presented; there are no technical words which require expert construction, nor are there complicated facts whose significance can be grasped only by expert analysts. Additionally, there are no circumstances here which address themselves to administrative discretion or the need for uniform decisional law. The sole issues here are the construction of defendant's tariff and the determination of whether defendant complied with its mandate. Therefore, defendant's claim that the Court is without jurisdiction is found to be without merit.

### B. *The Alleged Violation*

■■ The Supreme Court has held that the only lawful rate which a carrier may charge is that rate appearing in the carrier's filed tariff. Dayton Coal & Iron Co. v. Cincinnati, New Orleans & Texas Pacific Ry., 239 U.S. 446, 36 S.Ct. 137, 60 L.Ed. 375 (1915); Louisville & Nashville Ry. v. Maxwell, 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853 (1915); Louisville & Nashville Ry. v. Mottley, 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297 (1911); Texas & Pacific Ry. v. Mugg & Dryden, 202 U.S. 242, 26 S.Ct. 628, 50 L.Ed. 1011 (1906); New York, New Haven & Hartford Ry. v. ICC, 200 U.S. 361, 26 S.Ct. 272, 50 L.Ed. 515 (1906); Gulf, Colorado & Santa Fe Ry. v. Hefley & Lewis, 158 U.S. 98, 15 S.Ct. 802, 39 L.Ed. 910 (1895). This rate must be charged and paid regardless of seemingly innocent justifications for departure such as mistake, inadvertence or contrary intention of the parties. Louisville & Nashville Ry. v. Maxwell, *supra*, 237 U.S., at 97, 35 S.Ct. 494 (1915); Southern Pacific Co. v. Miller Abattoir Co., 454 F.2d 357, 359–360 (3d Cir. 1972); Johnson Machine Works Inc. v. Chicago, Burlington and Quincy R. R., 297 F.2d 793, 794–795 (8th Cir. 1962).[4] It has been recognized that such strict interpretation may work hardship. Louisville & Nashville Ry. v. Maxwell, *supra*; Southern Pacific Co. v. Miller Abattoir Co., *supra*; Silent Sioux Corp. v. Chicago and North Western Ry., 262 F.2d 474, 475–476 (8th Cir. 1959); Bull S.S. Lines v. Thompson, 123 F.2d 943, 944 (5th Cir. 1941); Prince Line Ltd. v. Amer. Paper Exports, Inc., 45 F.2d 242 (S.D.N.Y. 1930); Central Warehouse Co. v. Chicago, Rock Island & Pacific Ry., 20 F.2d 828 (8th Cir. 1927); Feraco, Inc. v. Georgia Pacific Corp., 313 F.Supp. 660, 662–663 (D.Del.1970). It has also been recognized that such interpretation may require decisions which are the reverse of those which would have obtained had the principles of equity been applied to the suit. United States v. Associated Air Transport, Inc., 275 F.2d 827, 832–834 (5th Cir. 1960); Armour & Co. v. Atchison, Topeka & Santa Fe Ry., 254 F.2d 719, 723–724 (7th Cir.), cert. denied, 358 U.S. 840, 79 S.Ct. 63, 3 L.Ed.2d 75 (1950); Bernstein Bros. Pipe & Machinery Co. v. Denver & Rio Grande Western R. R., 193 F.2d 441, 444 (10th Cir. 1951); Prince Line Ltd. v. Amer. Paper Exports, Inc., *supra*; Feraco, Inc. v. Georgia Pacific Corp., *supra*. Yet, the courts have adhered consistently to their strict reading of the tariffs in question in order to effectuate the congressional scheme against rebating and collusive pricing.

In Ludwig Mueller Co. v. Peralta Shipping Corp., 8 F.M.C. 361 (1965) the Commission was confronted with a friendly suit by shippers requesting a refund of overcharges which resulted from an unintentional entry on the carrier's tariff. In these appealing circumstances the Commission broke with its own precedent, see Swedish American Line—Application to Refund, 8 F.M.C. 142 (1964), and applied the reasoning of the above decisions to § 817(b)(3); it determined that mistake or inadvertence

---

4. *Many other cases have made the same point. See, e. g., United States v. Associated Air Transport, Inc., 275 F.2d 827, 832–834 (5th Cir. 1960); Silent Sioux Corp. v. Chicago and North Western Ry., 262 F.2d 474, 475–476 (8th Cir. 1959); Armour & Co. v. Atchison, Topeka & Santa Fe Ry., 254 F.2d 719, 723–724 (7th Cir.), cert. denied, 358 U.S. 840, 79 S.Ct. 63, 3 L.Ed.2d 75 (1958); Beaumont, Sour Lake & Western Ry. v. Magnolia Provision Co., 26 F.2d 72 (5th Cir. 1928); Central Warehouse Co. v. Chicago, Rock Island & Pacific Ry., 20* F.2d 828 (8th Cir. 1927); McFadden v. Alabama Great Southern R. R., 241 F. 562, 564 (3d Cir. 1917); Southern Ry. v. Champion Papers, Inc., 315 F.Supp. 881, 884 (W.D.N.C.1969); Feraco, Inc. v. Georgia Pacific Corp., 313 F.Supp. 660, 662–663 (D.Del.1970); Miller v. Ideal Cement Co., 214 F.Supp. 717, 720 (D.Wyo.1963); Reading Co. v. Dexter-Carpenter Co., 96 F.Supp. 650, 652 (S.D. N.Y.1951). See also Pacific Far East Line, Inc. v. FMC, 133 U.S.App.D.C. 269, 410 F.2d 257 (1969).

in the formulation of the tariff was not sufficient justification for permitting a carrier to charge or collect a rate other than that specified in its tariff. The Commission stated that the requirement of strict compliance with § 817(b)(3) "will result in more careful tariff administration and management by carriers and conferences." Id. at 364. The two dissenting commissioners argued vigorously that the language of the statute should not be read as an inflexible requirement where discrimination by carriers is not possible. The Commission has adhered to the majority position since *Mueller*. See, *e. g.*, Investigation of Rates in the Hong Kong—United States Atlantic and Gulf Trade, 11 F.M. C. 168, 178–179 (1967); Haras & Co. v. Boise Griffin S.S. Co., 9 F.M.C. 413 (1966); Ocean Freight Consultants, Inc. v. The Bank Line, Ltd., 9 F.M.C. 211 (1966); The East Asiatic Co.—Application, 9 F.M.C. 169 (1965).

The Court is persuaded that the Commission correctly interpreted § 817(b) in *Mueller* and the subsequent cases cited.

■ In applying these principles to the instant case, it appears that defendant has violated the mandate of § 817(b)(3). During the period between July 1, 1965 and July 27, 1966 defendant's tariff stated unequivocally that charges for wharfage, tollage and handling would be held for the account of cargo. Pan American admits that *it* paid the wharfage, tollage and handling charges between October 14, 1965 and July 27, 1966. Therefore defendant failed to conform to the requirements set out in its tariff.

Pan American argues that a statutory violation cannot be made unless the government proves the deviation from the published tariff was intentional and designed to deceive the shipping public and foster illegal or collusive pricing practices, citing Philippine Merchants S. S. Co. v. Cargill, Inc., 9 F.M.C. 155 (1965); Investigation of Certain Practices of Stockton Elevators, 8 F.M.C. 187 (1963); Misclassification and Mis-

billing of Glass Tumblers, 6 F.M.C. 155 (1960); Brokerage on Shipments of Ocean Freight-Max Le Pack, et al., 5 F.M.C. 435 (1958); Alleged Practices of Fabre Line, 4 F.M.C. 611 (1955). It claims that it could demonstrate at trial the absence of any such intent. In addition, defendant attempts to distinguish the *Louisville & Nashville Ry.* line of cases, cited above, on the grounds that they were based upon transgressions of statutes other than the Shipping Act. As for the *Mueller* decision and the cases adopting its view of § 817(b)(3) defendant asserts that those proceedings were instituted before the Commission on shippers' complaints. For these reasons, it argues, the principles discussed above are inapplicable here.

Taking the last points first, the fact that many of the above-cited cases were not Shipping Act decisions is of no consequence in the instant context. The language and congressional intent of the regulatory statutes under consideration, notably the Interstate Commerce Act, Part I, 49 U.S.C. § 6, are sufficiently similar to 46 U.S.C. § 817 to warrant congruent construction. See United States Navigation Co. v. Cunard S. S. Co., *supra*, 284 U.S. at pp. 480–481, 52 S.Ct. 247; City of Nome v. Alaska S. S. Co., 321 F.Supp. 1063, 1065 n. 5 (D.Alas. 1971); Prince Line Ltd. v. Amer. Paper Exports, Inc., *supra*. Compare 49 U.S.C. §§ 6(1)–(7), 317, 1373 with 46 U.S.C. § 817(b)(1)–(3). See also 46 U.S.C. § 844; 49 U.S.C. §§ 906(a)–(d), 1005. The fact that in many of the Commission decisions cited shippers were suing for refunds is also irrelevant to the construction of § 817(b)(3). It has been held many times that in an action predicated on failure to comply with a published tariff the balance of equities as between the parties is not at issue; the principle to be vindicated is that of compliance with the filed tariff. See the *Louisville & Nashville Ry.* line of cases cited *supra*.

Insofar as defendant seeks to support its claim that intent is a material element of a § 817(b)(3) violation, it relies on cases which concerned violations of §§

814–816 of Title 46. These sections require proof of knowledge and intent by their very terms before a transgression may be found. The short answer to defendant's point, then, is that the government alleges Pan American breached a section which does not on its face necessitate proof of intention. Defendant has failed to refer the Court's attention to a single authority in support of its position that the provision under which it is charged, § 817(b)(3), requires proof of intent before a violation can be found.[5]

The Court's own research reveals one reported case in which the intention of the tariff's authors was considered. In National Van Lines, Inc. v. United States, 355 F.2d 326 (7th Cir. 1966), an Interstate Commerce Commission order, upheld by the district court, held a group of motor vehicle carriers in violation of 49 U.S.C. § 317(b) for charging amounts greater than those listed in their tariffs. The case apparently involved overcharges of several million dollars which resulted from an inadvertent omission in the tariffs. After citing the cases which impose upon carriers the absolute obligation to collect only that amount specified in their tariffs, the Court went on to find ambiguities in the tariffs in question. It then proceeded to apply certain canons of construction, which included reference to the intention of the authors and to the practical application given the documents. The court held that

[a] strict construction of the tariffs against the carriers who drafted them is not justified when such construction ignores a permissible, reasonable construction which conforms to the intention of the framers of the tariff, avoids possible violations of the law, and accords with the practical application given by shippers and carriers alike.

The National Van Lines decision was rendered in an extraordinarily difficult context, and it has not been cited in a reported case. Insofar as the Court has been able to determine, the case stands alone in forgiving noncompliance with a published tariff on the basis of the author's intention and the tariff's practical application. In doing so it runs contrary to the wealth of cases cited earlier which require carriers to charge and collect only that amount stated in their tariffs. It also expresses a principle which flies in the face of the rule that any ambiguity in a tariff should be construed against its maker.[6] Finally, the posture of the litigation and the amount in question was such that the

---

5. In fact, the Commission has said that the express language of a tariff governs, not the "unexpressed intention". Sacramento-Yolo Port Dist. v. Fred F. Noonan Co., 9 F.M.C. 551, 558 (1966); Aleutian Homes, Inc. v. Coastwise Line, 5 F.M.C. 602, 608 (1959); National Cable & Metal Co. v. American-Hawaiian S.S. Co., 2 F.M.C. 470, 473 (1941). In Sacramento, supra, the Commission stated that construction of a tariff may be aided by reference outside its express language in only limited situations:

(1) where the language of the tariff is itself vague; or (2) where the tariff contains technical words which require interpretation because their meaning is not generally known (Aleutian Homes, Inc. v. Coastwise Line, supra; Thomas G. Crowe v. Southern S.S. Co., 1 U.S.S.B. 145 (1929)); or (3) there exists a custom or usage of a trade or course of dealing of the parties which,

although not specified in the tariff, is such that it should be applied.

Id. at 559. There is no suggestion that any of these factual circumstances are present in the instant case.

6. See Continental Can Co. v. United States, 272 F.2d 312, 315 (2d Cir. 1959); United States v. ICC, 91 U.S.App.D.C. 178, 198 F.2d 958, 966, cert. denied, 344 U.S. 893, 73 S.Ct. 212, 97 L.Ed. 691 (1952); United States v. Missouri-Kansas-Texas Ry., 194 F.2d 777, 778 (5th Cir. 1952); FMC v. Australia/U. S. Atlantic & Gulf Conference, 337 F.Supp. 1032, 1037 (S.D. N.Y.1972); Sacramento-Yolo Port Dist. v. Fred F. Noonan, Co., 9 F.M.C. 551, 558 (1966); Aleutian Homes, Inc. v. Coastwise Line, 5 F.M.C. 602, 609 (1959); Himala Int'l v. Fern Line, 3 F.M.C. 53, 54, 55 (1948); Rubber Dev. Corp. v. Booth S.S. Co., 2 F.M.C. 746 (1945). See also In re Agreement 9597, 12 F.M.C. 84, 102–103 (1968).

*National Van Lines* court may have felt obliged to shield the carriers from financial catastrophe; had the action been one for a civil penalty the court might have decided to assess the carriers in some modest fashion in order to further the continued effective operation of the tariff filing system. In any event, this Court views *National Van Lines* as an aberration which inclines towards the undermining of the scheme designed by Congress and strictly enforced by the courts. See Consolidated Freightways Corp. v. Admiral Corp., 442 F.2d 56, 61 (7th Cir. 1971). The Court views the principles enunciated in the cases discussed earlier as controlling and therefore declines to apply the *Van Lines* decision here.

Next, defendant argues as a matter of law that "an apportionment without a rate cannot have effect as a charge." Memorandum in Opposition, at p. 3; Affidavit of Edwin Longcope, dated December 17, 1971, at p. 4. It claims that while the introductory "language of apportionment" remained, the operative language, stating the rate per unit weight, had been deleted as of July 1, 1965. It asserts that the Commission has held invalid tariff clauses which require the shipper to refer to matter outside the four corners of the document in order to determine relevant charges, and that therefore it could not have legally collected the tollage, wharfage and handling charges, nor could the government have sued under § 817(b)(3) to compel it to collect such wharfage, tollage and handling charges. Thus Pan American suggests that the introductory language alone is insufficient to support a finding of a violation. Oddly enough, defendant seeks to draw support for its position from its assertion that no charges for wharfage, tollage or handling were assessed against shippers who utilized its service through the Miami port during the period in question.

The government responds affirmatively to the proposition that where shippers must look outside a tariff that tariff will be invalidated in a proceeding where a carrier seeks to collect from a shipper based on such a tariff. It points out, however, that while such a tariff will not be enforced against shippers, insofar as a civil penalty action against carriers is concerned, incomplete tariffs are the very documents which must be attacked under § 817(b), since by their nature they are susceptible to rebating and the granting of undue preferences and prejudices which the Shipping Act was intended to eliminate.

The Court agrees with the government's position. It is true that a carrier must state in its tariff all applicable rates, including rates for tollage, wharfage and handling, regardless of whether the carrier or terminal operator collects them. Certain Tariff Practices of Sea-Land Services, 7 F.M.C. 504, 506–508 (1963); Matson Navigation Company —Container Freight Tariffs, 7 F.M.C. 480, 484–489 (1963); Aleutian Homes, Inc. v. Coastwise Line, 5 F.M.C. 602, 612–613 (1959); Intercoastal Investigation, 1935, 1 F.M.C. 400, 433, 447–448 (1935); Intercoastal Rates of Nelson S. S. Co., 1 F.M.C. 326, 339 (1934); 46 U.S.C. § 817(b)(1); 46 C.F.R. § 531.9 (1972). As the Commission said in *Intercoastal Rates of Nelson S. S. Co.*, supra, at 340, clauses which require a shipper to look outside the tariff "open the gate" to rebates and other unfair practices. Thus, the rule penalizes a carrier which seeks to collect non-specific charges; it exacts a toll for failure to comply strictly with the congressional mandate in order to effectuate the policy underlying the mandate. The same theory is applicable in the instant situation; the carrier must be burdened for its lack of compliance with the mandate, not rewarded. Otherwise the Shipping Act would be saddled with the following absurdity: a carrier could defeat a civil action designed to redress failure to comply with statutory requirements by relying upon a principle which was created to deal with such failure in a different context. The result required by the statute is the reverse; the all-encompassing philosophy at work here is that the carrier is responsible to both its shipping

public and to the government for the precision of its tariff.

Viewed from its best advantage, defendant's tariff could be said to be ambiguous, or unclear. A prospective shipper, noting the introductory language stating that wharfage, tollage and handling will be for the account of cargo, might become confused upon observing the absence of a specific rate from the rate section of the tariff. An analysis of the situation fostered by this type of indefiniteness is instructive as to the justification for the rule that an ambiguous tariff should be construed against its maker, and for the corollary that the uncollectibility of non-specific charges should not be permitted to defeat a civil penalty action.

A prospective shipper could easily determine the applicable rates for wharfage, tollage and handling by referring to the tariff of the relevant port terminal on file with the Commission. See 46 C.F.R. § 533.1–.6 (1972). The shipper could reasonably expect to be assessed by Pan American for these services, since the introductory language in the tariff is unequivocal, despite the fact that it might be aware that such charges would be uncollectible before the Commission. Assuming that thereafter the shipper fails to receive a bill in accordance with these expectations, it could well believe that Pan American had bestowed favored treatment upon it. On the basis of this practice the shipper might be drawn to Pan American on future occasions.

There is no actual evidence that defendant intentionally utilized such a ploy to attract business,[7] nor is there any evidence that defendant charged some shippers while paying wharfage fees for others, although such a practice in this situation would be possible. But it is apparent that the uncertainty created by the introductory language of apportionment could constitute a vehicle for the pursuit by unscrupulous carriers of the very activities Congress sought to eliminate through the tariff filing system. In light of the need to preserve the integrity of the regulatory scheme the Court must reject in all respects defendant's argument that an apportionment without a rate cannot have effect as a charge.

Finally, defendant argues that because this is an action for imposition of civil penalties the principle of strict construction of tariffs set out in the *Louisville & Nashville Ry.* line of cases should be relaxed. It is improbable, however, that the courts or the Commission could be said to have been ignorant of the potential ramifications of their holdings *in* actions for civil penalties. But more importantly, defendant does not fall within the ambit of the principle it seeks to invoke. In Johnson v. Southern Pacific Co., 196 U.S. 1, 18, 25 S.Ct. 158, 162, 49 L.Ed. 363 (1904), the Court said, quoting Justice Story:

"penal statutes are not to be enlarged by implication, or extended to cases not obviously within their words and purport . . .. In short, it appears to me that the proper course in all these cases is to search out and follow the true intent of the legislature, and to adopt that sense of the words which harmonizes best with the context, and promotes in the fullest manner the apparent policy and objects of the legislature."

Later in United States v. Brown, 333 U.S. 18, 25–26, 68 S.Ct. 376, 380, 92 L.Ed. 442 (1948) the Court said:

[T]he canon in favor of strict construction is not an inexorable com-

---

7. The Court notes the government has averred the following in its moving papers, apparently based upon information officially furnished by the Commission:

Suit was commenced on the basis of an investigation by the F.M.C. into a shipper's complaint that Pan American Mail Line (PAML) was engaged in the unfair tactic of soliciting cargo from potential Panama Canal Zone con-

signees with the promise that PAML would absorb Miami handling and wharfage charges when PAML's published tariff provided that such charges were for the account of cargo.

Affidavit of Frank Grundman, dated December 9, 1971, at page 1. No further explication of this statement was placed before the court.

mand to override common sense and evident statutory purpose . . . Nor does it demand that a statute be given the "narrowest meaning"; it is satisfied if the words are given their fair meaning in accord with the manifest intent of the lawmakers.

Defendant's actions here fall squarely within the proscription of the statutory language and intent. The principle of strict or narrow reading of a penal statute does not assist the defendant.

■ Defendant contends that the courts which have strictly construed tariffs have done so after full hearings, and that therefore summary judgment is inappropriate here. But Pan American has failed to make even a minimal showing that this case turns on an issue of fact which necessitates a trial. Defendant's tariff stated that it would charge wharfage, tollage and handling to the account of cargo. Yet it has admitted that *it* paid for wharfage, tollage and handling during the period in question. The Court finds as a matter of law that defendant failed to meet its obligation to collect the rates and charges specified in its tariff.

Summary judgment has been granted in proper circumstances in civil penalty actions. Rawdon v. United States, 364 F.2d 803 (9th Cir. 1966); Corbin v. United States, 279 F.2d 431 (6th Cir. 1960); United States v. Hayes, 264 F.2d 929 (2d Cir. 1959); United States v. MacMullen, 262 F.2d 499 (2d Cir. 1958); United States v. Stangland, 242 F.2d 843 (7th Cir. 1957); Miller v. United States. 242 F.2d 392 (6th Cir. 1957); 6 J.Moore, Federal Practice ¶ 56.17 [44.–1] (2d ed. 1971). See also United States v. Sykes, 310 F.2d 417 (5th Cir. 1962). This is such a case.

Plaintiff's motion for summary judgment is granted. The parties are invited to submit affidavits containing information relevant to the Court's determination of the penalty to be assessed.

So ordered.